## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 1911004775 |
| JEFFREY ROSE, | ) | |
| | ) | |
| Defendant. | ) | |

**Submitted: March 11, 2022**
**Decided: June 30, 2022**

**Upon Defendant Jeffrey Rose's Motion to Suppress: GRANTED**

1.      Police officers patrolling a Wilmington neighborhood at night smelled marijuana while they drove past a parked car occupied by one individual.  The officers did not see any indication that marijuana was being smoked in the car and never saw anyone operating the vehicle.  After a single pass around the block, the officers detained the vehicle's occupant, who then allegedly spontaneously confessed to a variety of crimes.  The defendant now moves to suppress all the evidence obtained through his detention and subsequent arrest, arguing the officers' detection of an odor of marijuana associated with his parked vehicle was not reasonable suspicion to permit an investigative detention.  Because a vaguely described odor of marijuana connected with a parked vehicle did not give the officers reasonable articulable suspicion to believe criminal activity was afoot, the motion to suppress is granted.

1

**FACTUAL & PROCEDURAL BACKGROUND**

2.     The State offered the following facts at an evidentiary hearing conducted on November 5, 2021.  On November 8, 2019, three law enforcement officers assigned to Wilmington Police Department's Safe Streets division ("Safe Streets") were conducting "proactive patrol" in Wilmington's Southbridge area. Safe Streets is a joint task force comprised of officers assigned to Wilmington Police Department and Probation & Parole.[1]  On the night in question, Sergeant Matthew Rosaio and Detective James Wiggins were paired with Probation Officer Justin Phelps[2] (collectively, the "Safe Streets officers") and were patrolling their assigned area in an unmarked black Chevy Tahoe (the "Tahoe").  At the evidentiary hearing, Sergeant Rosaio described "proactive patrol" as "actively driving around in some of the more high-crime areas that are known throughout the city … looking for anything of a criminal nature or that would be suspicious that would require some sort of further investigation."[3]

3.     The Safe Streets officers' encounter with Defendant Jeffrey Rose ("Defendant") occurred in the 1300 block of B Street, which is intersected by Bradford and Claymont streets.  The Ezion Fair Church and Hicks Park sit on the

---

[1] Other officers have described Safe Streets as targeting "'violent offenders, . . . guns[,] and drugs,' by, among other things, making traffic stops for minor violations and 'tak[ing] every traffic stop as far as [they] can.'" *See Juliano v. State*, 260 A.3d 619, 622-23 (Del. 2021).

[2] Officer Phelps did not testify at the evidentiary hearing relating to the pending motion to suppress.

[3] *State v. Rose,* ID 1911004775 (Transcript) (Nov. 5, 2021) (hereinafter, "Tr.") 9-10.

Bradford Street end of the block, and the Neighborhood House Community Center sits on the Claymont Street end of the block. Between Bradford Street and Claymont Street is the largely residential area of B Street.[4] At approximately 10:00 p.m., when the events in question occurred, B Street was quiet, with little-to-no pedestrian or vehicle activity. The south side of B Street contains some residences, while the north side is vacant.[5] The Safe Streets officers did not have any tips or intelligence that criminal activity was occurring in the area at that time, but they view the neighborhood as a high-drug area that typically is quiet and dark at that time of night.[6]

4.      When they turned onto B Street from Bradford Street, the Safe Streets officers were travelling at approximately 10 to 15 mph, with all four windows of the Tahoe down. According to their testimony, Sergeant Rosaio and Detective Wiggins, who were in the front of the Tahoe, both "began detecting an odor of what [they have] learned through [their] training and experience to be marijuana."[7] Sergeant Rosaio noticed a black Chrysler (the "Chrysler") parked midway up the block across from the residential houses.[8] There were no other vehicles parked on the street.[9] According to the Safe Streets officers, the odor of marijuana intensified as the Tahoe

---

[4] *Id.* 12-14, 48-55.
[5] *Id.* 38, 74.
[6] *Id.* 10, 38, 75.
[7] *Id.* 17, 78.
[8] *Id.* 50-51, 55.
[9] *Id.* 77-78.

approached the Chrysler. Sergeant Rosaio observed a black male sitting in the driver's seat, leaned back, with the window open. The Safe Streets officers did not see any smoke or other indication that the vehicle's occupant was using marijuana at the time.[10] Sergeant Rosaio could not classify the marijuana smell as raw or burnt.[11] According to the officers, they did not see anyone else in the vehicle when they drove past it.

5. The Tahoe continued past the Chrysler and, according to testimony, the marijuana smell dissipated. Sergeant Rosaio and Detective Wiggins apparently were both able to detect a strengthening and weakening of the odor as the Tahoe continued down B Street.[12] In fact, Detective Wiggins testified to their shared observations regarding what "we," *i.e.* he and Sergeant Rosaio, smelled.[13] At this time, the Safe Streets officers, intent on further investigating the smell of marijuana, circled the block and again turned onto B Street from Bradford. At that time, Sergeant Rosaio and Detective Wiggins testified they "began detecting the same odor of marijuana to the same extent that [they] did the first time."[14]

6. After circling the block, Sergeant Rosaio, who was driving the Tahoe, stopped in the roadway about 15 to 20 feet behind the Chrysler. The Safe Streets

---

[10] *Id.* 57-59.
[11] *Id.* 57.
[12] *Id.* 21-22, 80.
[13] *See id.* 80. ("We drove passed [sic] the vehicle. As we got close, we smelled it stronger. We kept going.")
[14] *Id.* 22, 82.

4

officers did not activate their lights or sirens, and Sergeant Rosaio conceded Defendant could not have been known the Tahoe's occupants were law enforcement officers.[15] All three Safe Streets officers exited the Tahoe simultaneously and began approaching the Chrysler.[16] As they approached, Defendant "quickly exited" the driver's side of the vehicle carrying a bookbag.[17] Believing Defendant was about to flee the scene, Sergeant Rosaio ordered Defendant to stop, drop the bookbag, and put up his hands.[18]

7.  According to Sergeant Rosaio and Detective Wiggins, Defendant complied with that order and then "spontaneously uttered without being questioned"[19] that he (1) had an outstanding capias, (2) previously smoked marijuana, and (3) had ecstasy and psychedelics in the bookbag.[20] Defendant immediately was taken into custody and handcuffed, all within 30 seconds of the Safe Streets officers exiting the Tahoe.[21] While the officers were circling the block, a passenger apparently entered the Chrysler.[22] That person also was taken into custody, and a gray bottle containing Xanax and ecstasy was recovered from the

---

[15] *Id*. 62.
[16] *Id*. 23.
[17] *Id*. 23-24.
[18] *Id*. 24-25; 83.
[19] *Id*. 66-67.
[20] *Id*. 25, 83.
[21] *Id*. 26-28, 69-70.
[22] The officers did not see this occur and did not indicate they were aware of the passenger's presence when they detained Defendant. *See id.* at 26, 58, 84.

5

passenger's seat.[23] The officers later confirmed that Defendant had an outstanding capias. Upon further investigation, no marijuana or related paraphernalia was found in the Chrysler.[24] In fact, there was no evidence that anything ever had been smoked in the car.

8.     During the evidentiary hearing, Defendant challenged the officers' testimony.[25] For example, it is undisputed that, at some point during the interaction, additional Safe Streets units were called to the scene. But Defendant disagreed with the timing of when those officers arrived and some other aspects to the Safe Streets officers' testimony. Defendant testified that two vehicles simultaneously stopped near his parked car – the Tahoe and a grey car. Frightened, Defendant exited the car and saw law enforcement officers wearing police vests and pointing weapons at him. Defendant then stopped in accordance with Sergeant Rosaio's instructions. Defendant also denies volunteering that he had an outstanding capias, drugs, or previously smoked marijuana.

9.     On January 6, 2020, Defendant was indicted for Drug Dealing and Aggravated Possession in connection with the drugs seized during his arrest. On August 17, 2020, Defendant's counsel filed a motion to suppress all the evidence

---

[23] *Id*. 26, 70, 84-85.

[24] *Id*. 26, 68.

[25] The interaction between Defendant and the Safe Streets officers was not captured on body worn cameras, and the Safe Streets' dedicated radio channel does not record or otherwise memorialize officers' communications.

seized by the Safe Streets officers following Defendant's detention and arrest on November 8, 2019 (the "Motion"). In connection with that Motion, Defendant sought discovery regarding similar traffic stops conducted by Safe Streets. The Court entered orders on February 8, 2021, and June 17, 2021, permitting some of the requested discovery. An evidentiary hearing was held on November 5, 2021, after which the parties submitted supplemental briefing refining their arguments in light of the discovery and testimony.

**PARTIES' CONTENTIONS**

10. In his Motion to Suppress,[26] Defendant argues the Safe Streets officers' decision to stop him was pretextual and, even if it was not pretextual, the officers lacked reasonable articulable suspicion to detain him based solely on the odor of marijuana.[27] Defendant alternatively argues that he was arrested, rather than detained, when he was ordered to place his hands in the air.[28] In his post-hearing memoranda, Defendant reiterates his argument that the odor of marijuana the officers described, standing alone, does not amount to reasonable articulable suspicion to detain—or probable cause to arrest—him. Defendant contends Delaware's 2015 decriminalization of possession and use of a small amount of marijuana changed the legal landscape and compels the conclusion that the odor of

---

[26] D.I. 8.
[27] *Id.* ¶¶ 4-5, 8-9.
[28] *Id.* ¶ 8.

marijuana does not point to criminality.[29]  Moreover, Defendant asserts that law enforcement's or the Court's reliance on the amorphous and subjective nature of an "odor" of marijuana "exacerbates the practice of targeting motorists based upon race."[30]  For all those reasons, Defendant urges the Court to suppress all evidence seized by Wilmington Police following Defendant's detention or arrest.[31]

11.    The State, on the other hand, argues the Safe Streets officers possessed reasonable articulable suspicion to detain Defendant based on their detection of the odor of marijuana coming from his car and the fact that the vehicle was parked "on a dark, somewhat desolate street in a high-crime, high-drug area, at a time of night where community members would not be congregating in the area."[32]  The State also asserts the State Street officers had probable cause to arrest Defendant based on his admissions to having a capias, smoking marijuana, and possessing ecstasy.  Finally, the State argues Delaware's decriminalization of possession of personal use amounts of marijuana did not alter standards for probable cause or reasonable articulable suspicion.[33]  The State therefore contends Defendant's Motion should be denied.

---

[29] D.I. 60 at 9-11.
[30] *Id*. at 12-13.
[31] D.I. 8.
[32] D.I. 59 at 2.
[33] *Id*. at 3 (citing 16 *Del. C.* § 4764(h) ("Nothing contained herein shall be construed to repeal or modify any law or procedure regarding search and seizure.")).

8

**DISCUSSION**

12. The United States Constitution's Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"[34] Courts distinguish two types of seizures that law enforcement may conduct under the Constitution: an investigatory detention and an arrest. Law enforcement may detain an individual for investigatory purposes only if (i) the detention is supported by reasonable articulable suspicion of criminal activity, and (ii) the seizure is of limited scope and duration.[35]

13. Under Delaware law, a person is detained or "seized" within the meaning of Article I, § 6 of the Delaware Constitution when a reasonable person would have believed he or she was not free to ignore the police presence.[36] The State concedes Defendant was detained at the moment Sergeant Rosaio ordered him to freeze, drop the bookbag, and put his hands in the air.[37] The State also concedes Defendant was arrested shortly thereafter when he was placed in handcuffs after

---

[34] U.S. Cost. Amend. IV. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that the Fourteenth Amendment makes the Fourth Amendment applicable to the states). Article I, § 6 of the Delaware Constitution similarly provides: "The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."

[35] *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).

[36] *Jones*, 745 A.2d at 869. Delaware has declined to adopt the United States Supreme Court's definition of seizure as articulated in *California v. Hodari D.*, 499 U.S. 621 (1991). *See Jones*, 745 A.2d at 868.

[37] D.I. 59 at 2.

9

purportedly spontaneously confessing to smoking marijuana, possessing ecstasy, and having an outstanding capias.[38]

14.    The first question raised in Defendant's Motion, and the one the Court finds dispositive, is whether the Safe Streets officers has reasonable articulable suspicion to detain Defendant at the time they ordered him to freeze.  Whether law enforcement had reasonable suspicion to detain a person is evaluated based on the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with the officer's subjective interpretation of those facts.[39]  Reasonable suspicion is a "less demanding" standard than probable cause and requires a showing considerably less than proof by a preponderance of the evidence.[40]  The State bears the burden of proving the law enforcement officers possessed reasonable articulable suspicion at the time the seizure occurred.[41]

15.    To justify Defendant's detention, the officers' suspicion must have been that criminal activity was afoot.[42] Reasonable suspicion requires "some minimal level of objective justification" and must amount to something more than an officer's inchoate, vague suspicion.[43]  An officer must point to *specific* and

---

[38] *Id*. at 3.
[39] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Jones*, 745 A.2d at 861.
[40] *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989).
[41] *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001).
[42] *Bryant v. State*, 2017 WL 568345, at *1, n.1 (Del. Feb. 8, 2017).
[43] *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984)

articulable facts that, taken with the rational inferences to be drawn from those facts, reasonably justify the intrusion.[44] In this case, the only facts preceding Defendant's detention that the Safe Streets officers articulated were (1) a car occupied by one person, parked on a residential street at night in an area known for drug activity, and (2) the odor of marijuana associated with that car.[45] Everything that happened after the detention, including Defendant's purported confession, the discovery of drugs in the bookbag and car, the absence of marijuana in the car, and Defendant's outstanding capias, is not relevant to this analysis.

16. Defendant fairly questions the reliability of the Safe Streets officers' testimony regarding their ability to connect the odor of marijuana to the Chrysler. Although law enforcement officers receive specialized training that enables them to detect drug activity that might not be apparent to a civilian, neither Sergeant Rosaio nor Detective Wiggins testified that they received specialized training regarding the location or varying intensity of drug odors.[46] But the Court need not reach that

---

[44] *Terry*, 392 U.S. at 21; *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989).

[45] Defendant's action in leaving the car after the Tahoe pulled up behind him cannot be considered as evidence that he was attempting to flee from the police, since the State concedes Defendant could not have known the Tahoe was occupied by law enforcement. *Compare Jones*, 745 A.2d at 861, n.18 (noting flight or evasive action by a defendant who was aware he was being followed by police could be considered in determining whether there was reasonable articulable suspicion to detain defendant).

[46] Whether even the best training could give a law enforcement officer the olfactory ability of a bloodhound remains an open question for the Court. The Court shares Defendant's skepticism that law enforcement, traveling at 10-15 mph, could detect the concentration and dissipation of an odor of marijuana and pinpoint that odor to a parked car.

credibility issue because, even accepting the officers' testimony at face value, their vague description of the odor of marijuana does not rise to the level of reasonable articulable suspicion permitting Defendant's detention.

17.    This is true, at least in part, because merely possessing a small amount of marijuana no longer is a crime in Delaware.  Delaware's law regarding the use and consumption of marijuana has shifted over the last decade.[47]  In 2015, the General Assembly decriminalized the possession of personal use quantities of marijuana by adults.[48]  Under the current law, which was in effect at the time Defendant was detained, adults found in possession of one ounce or less of marijuana are subject to a monetary civil penalty but not a criminal charge.[49]  Use or consumption of marijuana by an adult in a *moving* vehicle is an unclassified misdemeanor.[50]

18.    On two recent occasions, the Delaware Supreme Court has addressed the odor of marijuana and its relevance to determining whether law enforcement had

---

[47] The State argues that the decriminalization of marijuana did not change the constitutional analysis of probable cause or reasonable suspicion, pointing to 16 *Del. C.* § 4764(h).  It is unclear whether the State raised this argument in *Juliano*, but the Supreme Court at least implicitly rejected that conclusion by analyzing probable cause based on "the crimes that an objectively reasonable police officer might suspect to a fair probability [a person] had committed based solely on the odor of marijuana." *Juliano*, 260 A.3d at 631.  In any event, a statute cannot alter the scope of the Constitution or the meaning of reasonable suspicion.  Perhaps for that reason, the State did not focus its arguments on this statute, and this section of the statute has no bearing on the Court's analysis.

[48] 2015 Del. Laws Ch. 38 (H.B. 39); 16 *Del. C.* § 4764.

[49] 16 *Del. C.* §§ 4701, 4764.

[50] *Id.* § 4764(d).

12

probable cause to arrest a person or conduct a warrantless search of a vehicle.[51]  In *Valentine v. State,[52]* the Delaware Supreme Court held that, although possession of a personal use amount of marijuana is not a criminal offense, the odor of marijuana is not "irrelevant to determinations of probable cause."[53]  The *Valentine* Court held that the totality of the circumstances, including the defendant's speed before he was pulled over, the time of day, and the odor of marijuana gave law enforcement officers probable cause to believe Valentine's car contained contraband, particularly marijuana.[54]

19.    Two years later, in *Juliano v. State,[55]* the Delaware Supreme Court held that law enforcement officers did *not* have probable cause to arrest a vehicle's passenger based solely on the officers' detection of an odor of marijuana emanating from the vehicle during a traffic stop.[56]  In *Juliano*, the officers conducted a traffic stop and, upon approaching the vehicle, almost immediately ordered all the occupants out of the vehicle and placed them under arrest.  Those arrests and attendant searches of the passengers were based exclusively on the odor of marijuana that one officer detected in the vehicle.[57]  In analyzing the case, the Supreme Court

---

[51] *Juliano v. State*, 260 A.3d 619 (Del. 2021); *Valentine v. State*, 2019 WL 1178765 (Del. 2019).
[52] 2019 WL 1178765 (Del. 2019).
[53] *Id*. at *2.
[54] *Id*.
[55] 260 A.3d 619 (Del. 2021).
[56] *Id*. at 622.
[57] *Id*. at 623, 625.

13

considered "the crimes that an objectively reasonable police officer might suspect to a fair probability [a person] had committed based solely on the odor of marijuana."[58] Relevant to the pending Motion, the Supreme Court held that the officers' vague description of an odor of marijuana emanating from the front of the vehicle did not amount to probable cause to believe the defendant had consumed marijuana in a moving vehicle when the officers did not provide any testimony (i) that the odor was raw or burnt, or (ii) make any observations suggesting the defendant was under the influence or recently consumed marijuana.[59] The Court also held vague testimony regarding a strong odor of marijuana does not permit a reasonable inference that the officers suspected the defendant possessed anything more than a personal use amount of marijuana.[60] Accordingly, because an amorphous description about an odor of marijuana in the front of the vehicle did not allow an objectively reasonable police officer to suspect to a fair probability that the defendant had committed a crime, the Court concluded the officers lacked probable cause to arrest the defendant.[61]

20. After *Juliano*, the State must articulate something more than a vague description of a marijuana odor in order to carry its burden of establishing probable

---

[58] *Id*. at 631.
[59] *Id*. at 632, 634.
[60] *Id*. at 634.
[61] *Id*. at 631, 634-35.

14

cause for an arrest or warrantless vehicle search. But the question raised by the pending Motion is whether the Safe Streets officers had *reasonable suspicion to detain* Defendant. Reasonable articulable suspicion is a lower standard than probable cause, and the Delaware Supreme Court has not had the occasion to address whether the odor of marijuana, standing alone, can rise to the level of reasonable articulable suspicion. Nevertheless, courts in other jurisdictions where possession of marijuana has been decriminalized have addressed this issue but have reached different conclusions.

21. In *State v. Francisco Perez*[62], the New Hampshire Supreme Court held that although the decriminalization of marijuana in that state did not make the odor of marijuana irrelevant to determining reasonable articulable suspicion, the changes to the law were "significant given the standard for reasonable, articulable suspicion."[63] The *Francisco Perez* court held "decriminalization . . . affect[s] the reasonableness of the officer's actions" after detecting an odor of marijuana, and the court refused to hold that the odor of marijuana, standing alone, gave law enforcement officers reasonable articulable suspicion of criminal activity.[64] The court ultimately held, however, that the odor of marijuana, coupled with officers' other observations, including the defendant's (i) slowness in stopping the vehicle,

---

[62] 239 A.3d 975 (N.H. 2020).
[63] *Id*. at 983-84.
[64] *Id*. at 985-86.

(ii) possession of three cell phones, (iii) nervous behavior, (iv) criminal record, and (v) use of a rented vehicle, satisfied the reasonable articulable suspicion standard.[65] In contrast, in *In re D.D.*, the Maryland Court of Appeals held that although the odor of marijuana alone does not give police probable cause to arrest an individual, it does amount to reasonable articulable suspicion to support a brief investigatory detention.[66]

22. Here, the analysis in *Juliano* provides a helpful framework for resolving whether the Safe Streets officers possessed reasonable suspicion that Defendant had engaged in criminal activity. First, because Defendant's vehicle was parked,[67] and the State Streets officers never saw Defendant operating the vehicle, they did not have reasonable suspicion that he had used or consumed marijuana in a moving vehicle or that he was driving under the influence. Second, courts repeatedly have found that the odor of marijuana alone does not allow law enforcement to evaluate the *amount* of marijuana a person might possess; the State in *Juliano* in fact

---

[65] *Id*. at 986.

[66] *In re D.D.*, 2022 WL 2207895, at *9-10 (Md. Jun. 21, 2022). This decision was issued after briefing in this case was complete. The parties in their supplemental briefing cited the Maryland Court of Special Appeals' decision, in which the intermediate appellate court held the odor of marijuana, standing alone, was not reasonable articulable suspicion of criminal activity. *See In re D.D.,* 250 A.3d 284 (Md. Ct. Spec. App. Apr. 28, 2021). *See also Com. v. Rodriguez*, 37 N.E.3d 611 (Mass. 2015) (holding on state constitutional grounds that odor of marijuana provided reasonable suspicion that a driver had committed a civil violation, but did not justify a traffic stop to enforce the civil penalty for possession of marijuana).

[67] The State did not provide any evidence that Defendant's car was running when it was observed by law enforcement.

acknowledged that the odor of marijuana on a person only indicates they smoked marijuana at some indeterminate point in the past.[68] And the State Streets officers here did not take the time to attempt to observe any factors indicating Defendant was engaged in drug dealing. Accordingly, the Safe Streets officers' detection of marijuana, which they could not distinguish as raw or burnt, could not have amounted to a reasonable suspicion that Defendant possessed more than an ounce of marijuana, if he possessed it at all.

23. Perhaps recognizing the paucity of the Safe Streets officers' testimony regarding the marijuana odor, the State points out that the residential street was quiet, dark, and in an area known for drug crimes.[69] But none of those factors change the foregoing analysis. That is, the time of night, lack of other people on the street, or the type of neighborhood do not make it more reasonable for police to suspect Defendant possessed more than an ounce of marijuana or was dealing drugs. Indeed, to credit the State's argument that the neighborhood or time of day permit the detention of any person to whom police attribute a vaguely described odor of marijuana would allow police to conduct investigatory stops entirely untethered from any constitutional restraints.

---

[68] *Juliano*, 260 A.3d 619, 634. *See also Rodriguez*, 37 N.E.3d at 618 (acknowledging "significant possibility that the odor of burnt marijuana may be present on a person or in a vehicle, but the drug itself is not."); *Lewis v. State*, 233 A.3d 86, 101-02 (Md. 2020) ("the odor of marijuana alone does not indicate the quantity, if any, of marijuana in someone's possession.").
[69] D.I. 59 at 2.

24.    To summarize, the Court finds that a vaguely described odor of marijuana associated with a parked vehicle, without any further credible testimony regarding whether the odor was burnt or raw and without any other facts suggesting the vehicle's occupant was engaged in criminal activity, does not amount to reasonable articulable suspicion justifying an investigatory detention of the vehicle's occupant.    Accordingly, Defendant Jeffrey Rose's Motion to Suppress is **GRANTED**.  **IT IS SO ORDERED**.


*/s/ Abigail M. LeGrow*
Abigail M. LeGrow, Judge


Original to Prothonotary
cc:    Andrew Vella, Deputy Attorney General
       Julia Mayer, Deputy Attorney General
       Thomas Foley, Esquire